Good morning, Your Honors. Vadim Zaspolsky for the petitioner Sergei Zurabov. Zurabov, okay. This case dealt with a petitioner who had three sons. The first two were in military service. The third one was summoned, and according to the laws of the Republic of Armenia, he was exempt. He went to the military commission. He complained. Despite that, they took his son anyway. His son was killed before basic training was even over. He was despondent. He complained. He was physically harmed as a result of it. He moved to Russia for several years. He came back. He had many other issues because of it. He was physically harmed. So as I understand it, the IJ denied relief on several grounds. One was credibility. Correct. And then he said, well, even if he's credible, he got to the other issues and found against him on the other issues as well. Went to the BIA, and they just said, not credible. Correct. So where did the IJ and the BIA go wrong on the adverse credibility determination? Well, first of all, there was two documents that supported his story. There was his party card, which the government found authentic, and there was a medical document that we had a big argument over that the government found wasn't authentic. Can I ask you a question about that medical document? Yes. Looking at it, is it in Russian, the original?  Well, the form is in Russian. I'm sorry, the font is in Russian. I'm sorry, what? I can check it, but I don't recall. But it was issued in Armenia. The medical form? Correct. But the form was in Russian. Correct, because basically it was the Soviet Union, and they used a lot of the former Soviet documents. And the translation didn't bear a lot of resemblance, actually, to the form. I mean, it was very hard to match up the form and their translation to begin with. I understand, but there was never an issue with the translation. The issue was the government said this hospital didn't exist. But they weren't translating what was on the form. I mean, in large part, anyway. I mean, it doesn't have the numbers, it doesn't have the form part of it. I'm not a competent translator. But basically what the issue was that the government investigator in Moscow submitted a report that said this hospital never existed. No one ever raised one word that the document wasn't properly translated or the harm wasn't described. It was basically, their argument was it didn't exist. And then the investigator went on to say, well, the medical terminology is off and the stamp wouldn't have been the same. But if I asked either of you how the investigator came to the conclusion that the hospital didn't exist or that the medical terminology wasn't right or that the stamp, no one could tell me because it does not say one word about how these facts were ascertained. The respondent testified for over four hours. It was a 69-year-old respondent. I believe the judge wasn't impartial. He probably asked about four times as many questions as the trial attorney. And I understand that you can ask tough questions. But this was, he went on for over 100 pages of the record whereas the trial attorney went over for 20. He called the respondent. Well, he has a job to ferret out the facts. He needs to understand what's going on. I found the transcript difficult to follow. I agree because there's a lot of back and forth between me and the judge. But I think a great point in the transcript was when the judge said, well, why did they call you this? Why didn't they just call you a chronic complainer? And the government tried to make light of this. Oh, he just gave you another option. No, he was demeaning the respondent. Weren't there several other factors on which the IJ found your client not to be credible? There were several points he pulled out. He put out the medical document. He brought up a lot of things where he just basically speculated. I wouldn't do this, so this can't be right. I wouldn't have done this, so this can't be right. Why you? Why not someone else? For example, when he complained, why would they put you on the front lines of the demonstration? Well, why not? He was older. He was more mature. He held a position in his party. The IJ said many times, several times in the transcript, I don't understand. This does not make sense to me. Well, one of the things with respect to his being on the front line, I have less trouble understanding why he might be up and placed on the front line. I have more trouble understanding, and this is echoing what the IJ wrote, why he would have been picked out and then persecuted when he was on the front line. He says that because they knew I was Armenian and they knew about my son. But there's nothing that would show how they would know that. Well, they actually said he was Azerbaijani. Excuse me, I'm sorry. No problem. And he says, well, it's by my last name, the O.V., but how did they know what your last name was? He held a position in his party. Just like any government agency would know who the leaders are in a certain party, this Armenian government would know who the leaders are in our People's Party. He held a post. I don't think it's – if they just picked a person on the street, I would agree with you. But he held a position in his party, and it's not unreasonable to think that the government of Armenia knew exactly who he was, what his background was. Yes, Your Honor. Is the – as he tells the story, both in his application and elsewhere, everything traces back to this issue about his son. Correct. Is that political persecution? I'm sorry? The POSIT did. Is that political persecution? No. No, the issue with his son gave rise to why he felt a certain way and chose to go into politics and try to correct change. For example, when he tried to explain why they picked him out, he said because they knew about – I'd been complaining about this thing with my son. Right. He was trying to fight an illegal act by the government of Armenia. Right. It was contrary to their own laws that they took his son who died before – I understand that, but I'm asking is that – if that was why he was picked out, is that persecution on account of political opinion? I think in the beginning that was. That's why he had the early problems. But then when he came back and he got involved in politics – That was what? I'm sorry? What's the answer to my question? Yes, in the beginning it was because of the issues with his son. Right, and is that persecution because of a political opinion? Yes, because he's fighting government – You earlier said no. No, I'm sorry. Let me rephrase. I'd like to equate that to government corruption, and he's standing up for something that's not right under the laws of the Republic of Armenia. I would say yes. And then he became involved in politics, and then he had numerous problems because of that. How do you respond to the confusion, if that's the right way to say it, about the – and I don't know how to pronounce this – the yerkrepos at the voting place? Confusion's the right word. Absolutely the right word, because that's the word my client used in his testimony. Yes, but I.J. said, well, you said one thing, but your statement says another, and he says I was confused. That's the normal way an I.J. says, well, you can't remember your lying story, therefore I don't believe you. So help me get past what the I.J. concluded as to this confusion. At this point, we're four hours in with a 69-year-old respondent. I.J. kept asking the same questions over and over and in different ways and over. Even the interpreter had to quit. The interpreter's like, look, I'm tired, I can't do this anymore. My client was 69 years old. He had answered, we have 300 pages of transcript. He got confused. Confusion is absolutely the right word to say it. And am I compelled to reject the I.J.'s conclusion that he was confused because he couldn't remember what his previous story had been and therefore his previous story was not true? Your Honor, if that was the only incident of persecution, if this was central to our case, if this was the only thing I put in front of you, I would agree. But there's many incidents. The I.J. chose to speculate throughout the whole decision, chose to ignore documents that we submitted. What about the new case on foreign documents? Engel? Yes. Yes, I'll comment on that. What differentiates that from our case is that Engel was arrested at the border. He was entitled to procedural due process. Our client was. But more importantly, let's go into the facts of Engel. That's not what the opinion said. Well, it said, yeah. That's worth the facts. Let me go into the facts, Your Honor. Basically, in Engel, the investigator went to the area where the alleged petitioner lived, took photos, then went to the Safiya police station, talked to the police officer who said there's no rooms that are described in the subpoenas. These officers who issued the subpoenas didn't work here, and the stamp is wrong. If I asked you what did the investigator in our case say, who knows? We don't know what he did. There's not one mention of anything that he did. And then the judge went into it at length, arguing why this report was not right. He said there was no foundation. We don't know what he did. We can't assume that he went anywhere. You should go to the Ministry of Health. The other circuits have found these reports unreliable. And then what did he do? He issued a decision saying, well, why would he lie? And then you know what my client's relatives did? They went to the Ministry of Health. They did exactly what he told the government to do. Okay. You've used all your time.  Thank you, Your Honor. I please the Court. Your Honors, Tim Remnitz on behalf of the United States Attorney General Loretta E. Lynch. This immigration case, Petitioner seeks review of an adverse credibility termination, but the agency provided specific, cogent reasons in the record to support the adverse credibility termination. And where the standard of review is whether the record compels a contrary conclusion, the government submits that the substantial evidence cited in the record supports this termination. There are three main instances in the record that support this adverse credibility termination. One is the subscription of the October 2002 rally. Two is the subscription of the March 2003 ballot stuffing incident. And three, the documents he submitted to support this claim. In particular, the medical document and his membership card. Starting with the first incident, his subscription of the October 2002 rally. He stated between his narrative statement and his testimony, he participated, along with 100,000 other people, at a political rally in front of the prosecutor's office. He was on the front line with 250 other people, and they were protesting. Later that night, he stated, around 8 p.m., close to his house, four individuals approached him, two dressed as yerkrapah, which he described as understanding to mean government soldiers dressed in camouflage, and two civilians attacked him and beat him, calling him... In his testimony, he described yerkrapah as his government soldiers. I thought he described very specifically what the word meant. He does, and he says they were dressed in camouflage. He said they were dressed in camouflage, but I don't remember him saying they were government soldiers, as opposed to protectors of the state. Protectors of the state, or keepers of the state. Okay, protectors of the state. Military members, I would submit. He didn't say military members, but go ahead. I mean, my understanding is that what they are is ex-military members, and he didn't say otherwise, I don't think. No. Anyway, go ahead. So, these two yerkrapahs and two civilians attacked him, beat him to the point of unconsciousness, and he stated that he was taken to the hospital by a neighbor, resulting in the medical certificate he submitted. What the immigration judge found implausible about this account, well, also I should add, when they beat him, they called him opposition dirt, an Azerbaijani dog. So, what the immigration judge found implausible about this was, one, well, he questioned him. Why were you singled out amongst these 100,000 other participants, or less, these 250 other individuals in the front line with you? And his first explanation to describe this was, well, it was based on an incident that happened six years prior. When I complained to the- But, you know what I mean, I have a problem with that question. Doesn't it just call for speculation? I mean, how would he know what- The petitioner points that out in his brief, like, right. No, but really, I mean, I wouldn't, you know, as a trial judge, you wouldn't let that question be asked. It calls for pure speculation. How would he know? It calls for speculation on his account. But he has the burden of showing why he was singled out, why it's plausible amongst 100,000 people. Why does he have the burden of showing why he was singled out? Well, it's his burden to prove his case. That he was singled out, but not why he was singled out. Well, it's true. There's a difference between what's plausible and what is possible. It's possible he was singled out for some unknown reason, or because he participated in the act. But is it plausible when there's 100,000 other participants, there's 250 other people on the front line, presumably- Well, he said he was on the front lines. He said he was an officer of this organization. And as to that, the IJ was also very skeptical. But he seemed to come up eventually with a- I mean, why, you know, this is a- Six people run the whole party. He said, no, we ran the district. So that made sense. There was nothing wrong with that. He testified he was one of six bureau members. And he testified there are eight bureaus in Yerevan. Right. So if you multiply that, that's 48 people on the front lines. That's 48 bureau members. Right. And so to say that out of these 50, they recognized him as a bureau member, that's basically his argument is that he was so prominent a leader, they knew him right off the bat. So it's stating that out of these 50 bureau members, these people just recognized him. Plus, it wasn't even established that they didn't also attack other people. How do we know? That's right. But is it plausible they attacked all the other people at the rally? Why would they plausibly single him out? They presumably did not attack the other 250 other people on the front line. Well, how do we know they didn't? That's what I'm asking you. Right. But is it plausible they followed 250 other people home? Not 250. It would be 50, as I understand it. The 50 bureau members. Right. So they would know those people. We don't know if they were all participating in the rally either. But the other problematic part of that is that they also called him an Azerbaijani dog. And that is stating they specifically knew who he was. They knew he was from Azerbaijan. They knew he was Sergei Zhuravov, bureau member. And is it plausible to know that they knew him out of these 50 other bureau members? Well, he was quick to come back and say, well, it was O.V. What? The O.V. in his last name. Right. So they must have known what his last name was spelled like. They must have seen his passport, what he said in his testimony. But is it plausible they saw his passport ahead of time? Maybe he was a respected individual in the community. Maybe they knew him. You can speculate any number of different things. Again, it's like, is it possible? But is it more than likely? Is it plausible? Well, it seems to me that it's implausible that they would have seen his passport. He probably held his passport at home or whatever. But that would be entirely unnecessary for them to know who he is and that his name ends with an O.V. if you accept the original premise, and that is they knew who he was. I mean, he'd been pointed out because he was a leader of the party. That's possible they knew who he was. And because he'd been a long-term pain in the neck, apparently. Or unrelated, not related to his political opposition. That doesn't matter, does it, in terms of whether they knew who he was. Well, they called him opposition dirt. So they were attacking him presumably because of his political opposition. Well, that's true, but the question is how do they know who he was? The fact that he'd been making a pain in the neck of himself for quite a while would answer that question. That's true. It's possible they could have known who he was. I think the immigration judge is reasonable in finding it's not plausible, though, that they knew him and they attacked him on this basis. Out of anyone else and they knew who he was, it's just 50 other Bureau members. For example, could the average person recognize all 50 members of the Senate in the United States? But he's not the average person. I would hope that the marshals who guard the Senate know. And if there was a rally outside the Senate, that they would know if the senator walked out, they'd know who he was. Each one of the 50 senators? I would think so. Well, I can tell you what the Supreme Court, that the marshals knew every one of the law clerks. Yeah, I think that's those people, yes. Right. Sure. Maybe in Washington I presume they'd know. Anyway, there's a second event that I think is more significant that I'd like to speak about as well. This is the March 2003 rally. And this is where he had a significant discrepancy about what was happening at that rally. In his asylum narrative, he stated that there was Yoruba, people in camouflage, military, people showing authority, were forcing people to take Robert Kocharian ballots to the ballot box. In his testimony, he stated these were civilian individuals, civilians who supported Robert Kocharian, and that they were bribing people, giving them the option of paying for their votes. And he was shown this discrepancy and asked to explain. Because in one version, it's an asylum claim. It's government soldiers or people dressed in camouflage that have clobed the authority of government at least, and they're forcing people through some kind of physical threat, presumably, to take ballots to the ballot box. That's an asylum claim. And the version he presented in his testimony was civilian people giving individuals the option of taking a bribe for their vote. That's not an asylum claim. For the person who was the president of the then president and the next president. Right, but there's no threat of force. So there's no implication that they're doing it on behalf of the government? On behalf of the government, but there's no threat of force. They're giving people the option of taking money for their vote. And that's good. Not good. And opposing that would not be political opposition? Well, it would not be political persecution. Why not? Because they're giving people the option of accepting money. They're not saying you're forced to do something by violence. I'm sorry. You mean that if somebody opposed the fact that the president... Oh, no, not his actions. What? Those are separate than his actions. I'm saying in one account he's stating that there's something very serious going on where there's soldiers forcing people to vote. Right, and it's not very serious if the president of the government is paying people for their vote? I believe it's... And that's not a ground for political opposition? Well, he did oppose that. I'm saying it's a less serious, it's not an event that he's opposing. It's a less significant event. It definitely enhances his claim, as this court would state, that there's soldiers forcing people to take votes to the ballot box as opposed to people bribing. But what happened to him at that time? So at this point he states he was one of 10 to 12 election monitors amongst international observers as well. And he complained these people were giving bribes or offering bribes. And he said he was taken behind the polling station and beaten. And the immigration judge further found this implausible because no one else was singled out for harm. Now granted, in his testimony he said he simply didn't know if anyone else was singled out. He knows that he was singled out. Does he know if anybody else complained? He doesn't know if anyone else complained either. Why would other people be singled out if they didn't complain? Well, again, he doesn't know if anyone else was singled out. But what makes it inherently implausible is that these people, according to his testimony, were doing it in the open. He specifically says they were openly bribing people within 50 meters of... Well, that's true, and everybody else may be openly accepting it. We don't, I mean... Right, so they seem to have no fear of reprisal. So why would they take the time to beat him for complaining? And why would they, moreover, the next day do threatening phone calls to him? Because they seem to be in the open, bribing people with no fear of being caught if they were doing it in the open. Well, you know, now you're speculating. I'm more interested on this one, the fact that the story doesn't stay the same. Because that's a very common way for an I.J. to support an adverse credibility finding, that he can't keep his story straight. The answer I got a moment ago was, well, this was the end of four hours. He's 69 years old, and he can't remember stuff because he's tired. How do you respond to that? I would say that's an explanation the I.J. is not forced to credit. He can reject that explanation. It is an explanation, but under the standard of review, the I.J. is reasonable in not crediting the explanation as an explanation of... Why is it so critical that he, you know, the importance of the Yirka Pak? Well, as I stated, I think it's... You know, why is that? Does that go to the heart of his claim? I believe it does because I'm trying to explain that these are military soldiers forcing people to vote. I think that's a much more significant incident than people who are just civilians bribing individuals. They're both not things you'd like to see. He was very upset, or he was complaining about corruption in the balloting process. Yes, he was. I think he was politically opposed to that, but in one instance with the Yirka Pak, I think if you throw that into your asylum claim, and that there was physical force as opposed to just voluntary acceptance... You mean physical force against voters. Right. I think it definitely makes the material... Can you tell me, first of all, he never said physical force. It was force, but presumably what kind of force would be force? I'm not sure you don't force people to do things by essentially paying them off. I don't really understand that. But where in the transcript is where he said something different about where the bribery piece is? And did they ask him then, well, you said before, something else? You're talking about this exchange about the Yirka Pak versus... No, I'm talking about that they say that you said that they were forced, and now you're saying they were bribed. Well, the culmination of that exchange was he was shown his Russian narrative, the original Russian... Okay. Where is that? You're talking about the narrative attached to his application. Right. One moment, please. Yes, as we noted, it was a very long transcript. That's why I can't find it. Okay. So around the administrative record page 233 is where this exchange takes place, over a few pages around there. And he's shown his Russian version around 233. That's what is repeated back to him through the translator that you said it by force. These Yirka Pak were ordering people to take these ballots in. At that point, that's when he stated, I was simply mixed up. Because at first he disavowed that he ever said Yirka Pak. He stated, oh, I never said Yirka Pak in my narrative statement. I always said civilians. But then he was shown these versions and said they read it back to him. Yirka Pak were forcing individuals to take these ballots. At that point, he said, oh, yes, it was Yirka Pak. I simply mixed it up. Could you explain the difficulty with the dates on the membership card? Yes. Obviously, the IJ is in your favor, but I want you to put your version out on the table, and you may then want to respond. So with the membership card, he was in the middle of his testimony, and he stated that in the last instance of mistreatment, on the May 23, 2003, after he complained about his lock ship, his shopping burned down, he went to complain at the police department and they detained him for three days. He added in his testimony suddenly that, oh, they confiscated my membership card then, too, and they destroyed it. And then it was brought to his attention that this membership card was actually post-dated that incident. It was dated July 3, 2003. And at first he was nonresponsive. He was shown this date that occurred after, but he just immediately testified the card was destroyed in May, and this card was dated two months later in July. Let me stop you for just a minute. If the card is destroyed, how do we know the date on the card? Well, exactly, and that's why they're confronting him with this new card. No, they're confronting him with the fact that the date on the card is July, but how do they know that the date was July when the card is destroyed? So we're presuming it's in existence of the first card, and he just said he got it at some point prior to that event in May 2003, and that card's gone. So then he's explaining, well, what is this card doing in the record then that's post-dated that? And that's when he explained, oh, I got a new card. Or at first he was nonresponsive, but then he finally stated, well, I got a new card, a friend. I got it right before I left Armenia. So what's wrong with an explanation of they took a card from me in May and destroyed it, and I have a card that's dated after the time they destroyed my other card? The problem with that explanation is that right after that, he testified about this May 2003 incident. He stated in June 2003, the very next month, he thought there was no longer any hope of staying in Armenia, and he made arrangements to leave Armenia permanently. So he sent his family to Russia in June 2003, and he started to make arrangements to come to the United States or leave Armenia permanently, and, in fact, he sought a visa to the United States on July 7, 2003, only a few days before he got this membership card. So it seems implausible that if he'd already decided to leave Armenia for good, why a month later would he take the time to get a new membership card? And moreover, at one point he's asked why he did not submit the original of this card, and he stated, well, why would I need the original? I was going to the United States. I wouldn't bring a card with me because I had no need of it in the United States. So it renders it implausible that why would he take the time to get a new one then? At that point he already decided to come to the United States, and as he said, I would not need such documents. And that's why this post-dated membership card rendered his account implausible. Thank you. Let's put two minutes on the clock. I believe the testimony was that his friend obtained a membership card form and sent him a copy. He never had the duplicated original. I believe this case, I think I.J. overstepped. I don't think that's what he said, actually, but I thought he said he got it and he left it home and then his friend went to the house and got it. Okay, and then sent him a copy. I think it was basically a lot of speculation. Thomas, why would he have done that? I'm sorry? So why would he have done that if he was leaving? Because he intended to apply for asylum in the United States. Yeah, and he was leaving. I understand, but if you're leaving and you intend to seek asylum or intend to leave. He didn't leave it home, he said, because I don't need it in the United States. The story doesn't make a lot of sense. Right, I assume at some point he contacted his friend and asked for a card. I understand that, but the question is why would he get the card? And one explanation is because he wanted it for asylum, but then he didn't take it for asylum. He said, why would I need it in the United States? So that's not the reason. So why would he get the card? It's possible that he needed his ID or he wanted to keep it. He was a member. He didn't renounce his membership. I don't know why he obtained it at that point. But the original was taken and he obtained a new one. I believe a lot of the decision was speculation by the judge. Am I understanding it correctly that his family is now, according to him, entirely in Russia? Correct. So nobody came with him? No. So we've got a 69-year-old man here all by himself, family in Russia. Correct. Okay. I have nothing further. Okay, thank you very much. Thank you. Mr. Romboff versus Lynch, submitted for decision. Thank you both for your arguments.
judges: Fletcher, Paez, Berzon